**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number: 2019-NMSC-012

Filing Date: May 16, 2019

NO. S-1-SC-36115

PUBLIC SERVICE COMPANY
OF NEW MEXICO,

      Appellant,

v.

NEW MEXICO PUBLIC REGULATION
COMMISSION,

      Appellee,

and

NEW ENERGY ECONOMY, INC.,
NEW MEXICO INDUSTRIAL ENERGY CONSUMERS, and
ALBUQUERQUE BERNALILLO COUNTY WATER
UTILITY AUTHORITY,

Interveners-Appellees/Cross-Appellants,

and

WESTERN RESOURCE ADVOCATES, NEW MEXICO
ATTORNEY GENERAL, and COALITION FOR CLEAN
AFFORDABLE ENERGY,

      Interveners-Appellees.

In the Matter of the Application of
Public Service Company of New Mexico
for Revision of its Retail Electric Rates
Pursuant to Advice Notice No. 513,
NMPRC Case No. 15-00261-UT

APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION

Released for Publication July 9, 2019

PNM Resources, Inc.
Patrick V. Apodaca
Stacey J. Goodwin
Albuquerque, NM

Miller Stratvert, P.A.
Richard L. Alvidrez
Albuquerque, NM

Keleher & McLeod, P.A.
Thomas C. Bird
Albuquerque, NM

for Appellant

Michael C. Smith
Santa Fe, NM

for Appellee

New Energy Economy
Mariel Nanasi
Santa Fe, NM

for Intervener-Appellee/Cross-Appellant New Energy Economy

Peter Jude Gould
Santa Fe, NM

for Intervener-Appellee/Cross-Appellant New Mexico Industrial Consumers

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes
Nann M. Winter
Albuquerque, NM

Dahl L. Harris
Santa Fe, NM

for Intervener-Appellee/Cross-Appellant
Albuquerque Bernalillo County Water Utility Authority

Steven S. Michel
Santa Fe, NM

for Intervener-Appellee Western Resources Advocates

Hector H. Balderas, Attorney General
Joseph M. Yar, Assistant Attorney General

for Intervener-Appellee New Mexico Attorney General

Charles F. Noble
Santa Fe, NM

for Intervener-Appellee Coalition for Clean Affordable Energy

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Carol A. Clifford
Santa Fe, NM

for Amicus Curiae El Paso Electric Company

**OPINION**

**VIGIL, Justice.**

**{1}**     This appeal arises from the final order of the New Mexico Public Regulation Commission (Commission) granting part, but not all, of the increase in retail electric rates sought by the Public Service Company of New Mexico (PNM) in Case No. 15-00261-UT. The Commission's final order is appealed by PNM and cross-appealed by the Albuquerque Bernalillo County Water Utility Authority (ABCWUA), New Energy Economy (NEE), and the New Mexico Industrial Energy Consumers (NMIEC). On appeal, PNM, NEE, ABCWUA, and NMIEC all raise numerous issues with the Commission's final order. In this opinion we address challenges made to the Commission's decisions regarding Palo Verde Nuclear Generating Station, the installation of balanced draft technology at San Juan Generating Station, the new coal supply agreement at Four Corners Power Plant, the inclusion of Rate 11B in rate banding, PNM's prepaid pension asset, and the adoption of Method A.

**{2}**     With respect to Palo Verde, PNM appeals the Commission's denial of recovery in its rate base for (1) the repurchase of 64.1 MW of Palo Verde Unit 2 capacity at a valuation of $2,550/kW; (2) $49 million in improvements made to Palo Verde Unit 2; and (3) future recovery for nuclear decommissioning costs. In separate cross-appeals, NEE and ABCWUA each challenge the Commission's decision to allow PNM to recover for the repurchased 64.1 MW at a net book value of $1,306/kW and for the cost of renewing five leases at Palo Verde. We additionally address ABCWUA's argument that the Commission violated its right to due process by refusing to reopen the proceedings to allow replies to PNM's response to a bench request regarding Palo Verde.

**{3}**     We also answer the remaining challenges to the Commission's final order: PNM's appeal to the Commission's decision to deny recovery of $52.3 million for the

installation of balanced draft technology at San Juan Generating Station; NEE's claim that the Commission acted unreasonably and unlawfully by allowing recovery of $19.5 million for the new coal supply agreement at Four Corners Power Plant; ABCWUA's challenge to the Commission's decision to reject PNM's proposal to exclude Rate 11B from rate banding; and NMIEC's arguments that the Commission acted unreasonably or unlawfully by allowing recovery of $137.8 million for PNM's prepaid pension asset and by adopting the Method A rate adjustment.

**{4}** We reject each of the arguments on appeal except one: we conclude that, by denying PNM any future recovery for its nuclear decommissioning costs related to the Palo Verde capacity at issue in this case, the Commission denied PNM due process of law. Therefore, we declare all other aspects of the Commission's final order to be lawful and reasonable, yet must annul and vacate the final order in its entirety pursuant to NMSA 1978, Section 62-11-5 (1982). *See Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1993-NMSC-032, ¶ 6, 115 N.M. 678, 858 P.2d 54 (concluding that the Court may declare parts of an order to be reasonable and lawful while vacating an order in its entirety pursuant to Section 62-11-5). We remand the case to the Commission for further proceedings as required and the entry of an order consistent with this opinion. *See Hobbs*, 1993-NMSC-032, ¶ 6 (recognizing that on remand "the Commission may properly enter an order embodying those provisions in the earlier, vacated order that have been declared reasonable and lawful"); *Pub. Serv. Co. v. N.M. Pub. Serv. Comm'n*, 1979-NMSC-042, ¶¶ 13, 24, 92 N.M. 721, 594 P.2d 1177 (remanding to the Commission for the entry of an order based on substantial evidence and acknowledging that the Commission may conduct additional hearings as necessary).

## I.  BACKGROUND

**{5}** The complexity of this case compels us to begin our opinion by setting forth a brief overview of the procedural history as well as the relevant legal background. *See New Energy Economy v. Pub. Regulation Comm'n*, 2018-NMSC-024, ¶ 2, 416 P.3d 277. Additional background is provided as necessary in our discussion.

### A.  Procedural Background

**{6}** On August 27, 2015, PNM filed an application with the Commission claiming a revenue requirement of approximately $123 million. In accordance with its procedural rules, the Commission appointed a hearing examiner to preside over the ratemaking proceedings and submit a recommended decision to the Commission. *See* 1.2.2.29(B), (D)(4) NMAC. Nearly twenty parties filed motions to intervene in the proceedings and, in a public hearing lasting three weeks and a two day supplemental hearing, over forty witnesses presented testimony on PNM's proposed rate increase.

**{7}** After the hearing examiner issued her corrected recommended decision and the parties filed their exceptions to her recommendations, the Commission issued its final order that incorporated and adopted the corrected recommended decision except as expressly modified or disapproved. The Commission's final order approved a revenue

increase of $61.2 million. The appeal and cross-appeals are taken directly from that order. *See* NMSA 1978, § 62-11-1 (1993) ("Any party to any proceeding before the [C]ommission may file a notice of appeal in the [S]upreme [C]ourt asking for a review of the [C]ommission's final orders.").

## B.      Legal Principles Governing Rate Cases

**{8}**     We next set forth the general legal principles which apply to the setting of retail electric rates by the Commission. The Commission has the general and exclusive power to regulate a public utility's rates under NMSA 1978, Section 62-6-4(A) (2003). A utility's rates are generally based upon the utility's revenue requirement, the traditional elements of which are "(1) determination of the costs of the operation, (2) determination of the rate base which is the value of the property minus accrued depreciation, and (3) determination of the rate of return." *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1980-NMSC-005, ¶ 5, 94 N.M. 731, 616 P.2d 1116.

**{9}**     The Commission has the obligation to ensure that "[e]very rate made, demanded or received by any public utility [is] just and reasonable." NMSA 1978, § 62-8-1 (1941). In meeting this obligation, the "Commission is vested with considerable discretion." *Hobbs*, 1980-NMSC-005, ¶ 4. The utility seeking an increase in rates bears the burden of demonstrating that the increased rate is just and reasonable. NMSA 1978, § 62-8-7(A) (2011).

**{10}**    "The Commission [is] not bound to the use of any single formula or combination of formulae in determining rates. The rate-making function involves the making of pragmatic adjustments. It is the result reached, not the method employed, which is controlling." *Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1977-NMSC-032, ¶ 70, 90 N.M. 325, 563 P.2d 588. By statute, the Commission must balance

> the interest of consumers and the interest of investors . . . to the end that reasonable and proper services shall be available at fair, just and reasonable rates and to the end that capital investment may be encouraged and attracted so as to provide for the construction, development and extension, without unnecessary duplication and economic waste, of proper plants and facilities and demand-side resources for the rendition of service to the general public and to industry.

NMSA 1978, § 62-3-1(B) (2008). This balance between the interests of ratepayers and the interests of investors means that

> the Commission must ensure that rates are neither unreasonably high so as to unjustly burden ratepayers with excessive rates nor unreasonably low so as to constitute a taking of property without just compensation or a violation of due process by preventing the utility from earning a reasonable rate of return on its investment.

*PNM Gas Servs. v. N.M. Pub. Util. Comm'n (In re PNM Gas Servs.)*, 2000-NMSC-012, ¶ 8, 129 N.M. 1, 1 P.3d 383. We have recognized that "[t]here is a significant zone of reasonableness" in which rates are neither ratepayer extortion nor utility confiscation. *Id.* (quoting *Behles v. N.M. Pub. Serv. Comm'n (In re Application of Timberon Water Co.)*, 1992-NMSC-047, 114 N.M. 154, 836 P.2d 73).

**{11}** Despite the Commission's considerable discretion in the setting of just and reasonable rates, "the Commission is not free to disregard its own rules and prior ratemaking decisions or 'to change its position without good cause and prior notice to the affected parties.' " *PNM Gas Servs.*, 2000-NMSC-012, ¶ 9 (quoting *Hobbs*, 1993-NMSC-032, ¶ 12). We also acknowledge that, despite the discretion and flexibility afforded to the Commission, our review of its decisions is not "superficial in nature" and that we "must review the method employed by the Commission and the Commission's application of its chosen methodology to the evidence in the record in order to determine in a meaningful way whether the result is unreasonable or unlawful." *PNM Gas Servs.*, 2000-NMSC-012, ¶ 103.

## II.     STANDARD OF REVIEW

**{12}** We review the Commission's order to determine whether the "[Commission's] decision is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 9, 140 N.M. 6, 139 P.3d 166; *accord* NMSA 1978, § 62-11-4 (1965). The party challenging the Commission's order has the burden of making this showing. Section 62-11-4.

**{13}** In reviewing the Commission's decisions, we first consider whether the decision presents a question of fact, a question of law, or a combination of the two. *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n (NMIEC)*, 2007-NMSC-053, ¶ 13, 142 N.M. 533, 168 P.3d 105. Both questions of fact and questions of law are implicated in the numerous issues on appeal in this case.

**{14}** For questions of fact, this Court "look[s] to the whole record to determine whether substantial evidence supports the Commission's decision." *Id.* ¶ 24. Substantial evidence requires that there is evidence "that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* (quoting *Att'y Gen. of N.M. v. N.M. Pub. Util. Comm'n (In re Comm'n's Investigation of the Rates for Gas Serv. of PNM's Gas Servs.)*, 2000-NMSC-008, ¶ 4, 128 N.M. 747, 998 P.2d 1198). "We view the evidence in the light most favorable to the Commission's decision, and draw every inference in support of the Commission's decision, but we will not uphold the decision if it is not supported by substantial evidence." *NMIEC*, 2007-NMSC-053, ¶ 24 (citations omitted). "The [Commission's] decisions requiring expertise in highly technical areas, such as utility rate determinations, are accorded considerable deference." *Albuquerque Bernalillo Cty.*

*Water Util. Auth. v. N.M. Pub. Regulation Comm'n (ABCWUA)*, 2010-NMSC-013, ¶ 50, 148 N.M. 21, 229 P.3d 494 (internal quotation marks and citation omitted)).

**{15}** On questions of law, "[w]e will reverse the agency's interpretation of a law if it is unreasonable or unlawful" and generally give little deference to the Commission's construction of statutes. *NMIEC*, 2007-NMSC-053, ¶ 19. However, we accord some deference to the Commission's interpretation of its own governing statutes and

> will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function. However, the court is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law.

*Id.* (quoting *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28).

**{16}** Several parties also argue that various decisions of the Commission are arbitrary and capricious. "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in the light of the whole record." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. We consider the issues raised on appeal under the overarching legal principles governing rate cases by applying the foregoing standards of review depending on whether a particular argument challenges the facts, the law, or both.

## III.    PALO VERDE NUCLEAR GENERATING STATION

**{17}** We first address the challenges made to the Commission's determination to allow PNM to recover part, but not all, of its costs associated with Palo Verde Nuclear Generating Station. We begin with a brief factual background of PNM's involvement at Palo Verde, setting forth the facts relevant to PNM's request to recover its costs in retail electric rates.

**{18}** PNM's participation at Palo Verde began in 1977 when the Commission granted PNM a certificate of public convenience and necessity to own, operate, and maintain an interest in each of the plant's three units. *See* NMSA 1978, § 62-9-1(A) (2005) ("No public utility shall begin the construction or operation of any public utility plant or system . . . without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction or operation."). In 1985 and 1986, in Case Nos. 1995 and 2019, the Commission authorized PNM to sell its ownership interests in Palo Verde Units 1 and 2 and then lease those interests back for approximately twenty-nine and twenty-nine and a half years, respectively.

**{19}** Under the terms of the leases, PNM had three choices when the leases expired: (1) allow the lease to expire; (2) renew the lease at fifty percent the cost of the original

lease; or (3) purchase the lease asset at a fair market value. In Case Nos. 1995 and 2019, the Commission granted PNM authority to exercise its options to renew the leases or repurchase the capacity in accordance with these lease terms. Although it authorized PNM to retain the Palo Verde interests at the expiration of the original leases, the Commission retained full ratemaking authority over Palo Verde, including "the authority to disallow any or all of the lease expenses and transaction costs on a used-and-useful basis, on the basis of imprudency in the cost of the Facilities, or on any other lawful basis[.]"

**{20}** At the expiration of the leases on Palo Verde Units 1 and 2, PNM elected to repurchase 64.1 MW of Palo Verde Unit 2 capacity at a negotiated price of $2,550/kW and to renew the five leases on the remaining capacity for eight years at fifty percent of the original cost. In this case, PNM sought to include the repurchased 64.1 MW in its rate base at a valuation of $2,550/kW. As the full purchase price for the 64.1 MW, the $2,550/kW represented both the net book value of Palo Verde Unit 2 and an acquisition adjustment for the amount paid over that net book value. *See Hobbs,* 1980-NMSC-005, ¶ 8 (defining an acquisition adjustment as "the amount paid for a plant in excess of original cost less accrued depreciation"). PNM also sought to include in its cost of service the $19.8 million in annual lease expenses for the five renewed leases. Finally, PNM sought to include an additional $49 million in its rate base for leasehold and common plant improvements to the 64.1 MW incurred under the original leases.

**{21}** Existing utility jurisprudence grants wide latitude to the Commission's choice of methodology used to determine a utility's rate base. *Hobbs*, 1980-NMSC-005, ¶ 6 ("Neither New Mexico case law nor the Public Utility Act imposes any one particular method of valuation upon the Commission in ascertaining the rate base of a utility."); *see* NMSA 1978, § 62-6-14(A) (2009). However, the Commission "is bound by, and limited to . . . previously established methods of ratemaking, absent a change in circumstances peculiar to the company and the pending case, making it necessary that there be a departure from established method." *Hobbs*, 1993-NMSC-032, ¶ 8 (quoting *Gen. Tel. Co. of the Sw. v. Corp. Comm'n (In re Gen. Tel. Co. of the Sw.)*, 1982-NMSC-106, ¶ 29, 98 N.M. 749, 652 P.2d 1200). In prior cases, the Commission has considered whether expenditures were prudently incurred and whether the asset is used-and-useful in providing service when determining the ratemaking treatment of expenditures on utility plants. *Pub Serv. Co. of N.M. (PNM)*, 101 P.U.R. 4th 126, 149-53 (N.M. Pub. Serv. Comm'n 1989). "The prudent investment theory provides that ratepayers are not to be charged for negligent, wasteful or improvident expenditures, or for the cost of management decisions which are not made in good faith." *Id.* at 151. "To be considered 'used and useful,' [a] property must either be used, or its use must be forthcoming and reasonably certain; and it must be useful in the sense that its use is reasonable and beneficial to the public." *Id.* at 162.

**{22}** After considering the evidence in this case, the hearing examiner concluded that PNM's decisions to renew the five leases and repurchase the 64.1 MW were imprudent because, *inter alia*, PNM failed to demonstrate that it "reasonably examined alternative courses of action." Finding PNM's decisions imprudent, the hearing examiner

recommended that the Commission fully deny PNM recovery for all the costs attributed to renewing the five leases and repurchasing the 64.1 MW.

**{23}** The Commission adopted the hearing examiner's conclusion that PNM's decisions were imprudent on the basis that PNM had failed to demonstrate that it considered alternative courses of action. The Commission further adopted the hearing examiner's separate finding that PNM had failed to establish that it paid fair market value for the repurchased 64.1 MW, as required by the prior authorizations in Case Nos. 1995 and 2019. However, the Commission rejected the total cost disallowance recommended by the hearing examiner and instead imposed alternative remedies for PNM's imprudence.

**{24}** With regard to PNM's repurchase of the 64.1 MW, the Commission denied PNM's request to recover for that capacity at $2,550/kW and instead allowed PNM to "bring the [64.1 MW] into the rate base at a reasonable value based on [its] net book value" of $1,306/kW. For the renewed leases, the Commission allowed PNM to fully recover its costs because "the amount of those lease renewals was known to the Commission at the time it approved the lease transaction in that the terms of the leases expressly stated that the leases would be renewed at [fifty percent of the original cost]." The Commission further concluded that because PNM's decisions in "renewing and reacquiring the leases . . . exposed ratepayers to costs associated with [nuclear] decommissioning responsibilities that likely would not have been incurred had an alternative resource other than nuclear been selected . . . the appropriate remedy to protect ratepayers from the effect of PNM's imprudence is to shift the future burden of [nuclear] decommissioning related costs from the ratepayers to PNM." Finally, the Commission denied PNM separate recovery of the $49 million for leasehold and common plant improvements because the recovery of the $1,306/kW net book value included the value of those improvements.

**{25}** The Commission's final order on Palo Verde is challenged by several parties on various grounds, which we address as follows. In Section A, we address PNM's challenges to the Commission's finding that PNM failed to demonstrate that its decisions to retain the Palo Verde assets were prudent. In Section B, we address PNM's, NEE's, and ABCWUA's various challenges to the Commission's chosen remedies for PNM's imprudence. In Section C, we address PNM's arguments regarding the Commission's denial of a separate recovery for the leasehold improvements to the 64.1 MW. Finally, in Section D, we address ABCWUA's argument that the Commission's decisions on Palo Verde were made in violation of its rights to due process of law.

### A. The Commission's Determination of Imprudence Was Lawful and Reasonable

**{26}** PNM challenges the Commission's conclusion that the repurchase of the 64.1 MW and the lease renewals were imprudent on three grounds. First, PNM argues that it was unreasonable for the Commission to even consider the prudence of its decisions

regarding Palo Verde. Second, PNM argues that the Commission departed from the established prudence standard by requiring PNM to demonstrate that the repurchased 64.1 MW and the five renewed leases were PNM's "least cost alternatives." Third, PNM asserts that the Commission's finding of imprudence was arbitrary and capricious, contrary to law, and not supported by substantial evidence. We address each argument in turn.

## 1. The Commission's review of PNM's prudence was not contrary to its prior orders authorizing PNM to retain the Palo Verde assets

**{27}** PNM argues that it was not required to demonstrate the prudence of its decisions to repurchase the capacity or renew the leases at Palo Verde because these actions were previously authorized by the Commission in Case Nos. 1995 and 2019. Specifically, PNM contends that its decisions were made in reliance on these prior authorizations, which PNM claims the Commission has now disregarded without notice. We disagree.

**{28}** In Case Nos. 1995 and 2019, the Commission granted PNM authority to exercise its options to either renew the leases or repurchase the capacity in accordance with the terms of the leases. We agree with the Commission that these prior authorizations relieved PNM of its obligation to obtain permission to retain the Palo Verde capacity but did not, as PNM contends, relieve PNM from establishing that its decisions to do so were prudent. *See* NMSA 1978, § 62-6-12(A)(4) (1989) ("With the prior express authorization of the commission, but not otherwise . . . any public utility may sell, lease, rent, purchase or acquire any public utility plant or property constituting an operating unit or system or any substantial part thereof[.]"). In both Case Nos. 1995 and 2019, the Commission retained full ratemaking authority over Palo Verde, including "the authority to disallow any or all of the lease expenses and transaction costs on a used-and-useful basis, on the basis of imprudency in the cost of the Facilities, or on any other lawful basis[.]" Such a clear and unequivocal reservation of authority was sufficient to put PNM on notice that the Commission would indeed consider whether PNM's decisions at Palo Verde were prudent for purposes of ratemaking and that PNM would have the burden of making that showing. We conclude that PNM was required to demonstrate its prudence regarding Palo Verde, regardless of the Commission's prior authorizations in Case Nos. 1995 and 2019.

## 2. The Commission did not depart from the established standard of prudence

**{29}** In her recommended decision, the hearing examiner expressed the prudence standard this Court previously recognized in *PNM Gas Services*, 2000-NMSC-012, ¶ 63. Quoting Case No. 2087, the hearing examiner stated:

> Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made. In determining whether a judgment was prudently made, only those facts available at the

time judgment was exercised can be considered. Hindsight review is impermissible.

Imprudence cannot be sustained by substituting one's judgment for that of another. The prudence standard recognizes that reasonable persons can have honest differences of opinion without one or the other necessarily being "imprudent."

**{30}** PNM does not disagree with the prudence standard articulated above, but rather contends that the Commission departed from that established prudence standard in its application by focusing entirely on whether PNM demonstrated that the repurchased 64.1 MW and the five renewed leases were PNM's "least cost alternatives." *See PNM Gas Servs.*, 2000-NMSC-012, ¶ 9 ("[T]he Commission is not free to disregard its own rules and prior ratemaking decisions or to change its position without good cause and prior notice to the affected parties." (internal quotations and citation omitted)). PNM's argument is unpersuasive.

**{31}** The hearing examiner concluded that PNM was imprudent because, *inter alia*, a reasonable person under the circumstances faced by PNM's management would have adequately considered alternatives to retaining the Palo Verde assets. The Commission adopted this conclusion by reference. By requiring PNM to demonstrate that its management adequately considered alternatives when it decided to repurchase the 64.1 MW and renew the five leases, the hearing examiner and Commission reasonably applied the prudence standard to PNM's decisions.

**{32}** We pause, before concluding our analysis of this argument, to note that it was not inappropriate for the Commission to address whether PNM had demonstrated Palo Verde to be cost-effective or the lowest cost alternative. We observe that there is a meaningful relationship from the perspective of the ratepayers between the consideration of alternatives and the cost of the chosen generation resource. The goal of the consideration of alternatives is, of course, to reasonably protect ratepayers from wasteful expenditure. *PNM*, 101 P.U.R. 4th at 151. The failure to reasonably consider alternatives was a fundamental flaw in PNM's decision-making process. *See In re PacifiCorp (PacifiCorp),* UE 246, Order No. 12-493 at 26-27, 2012 WL 6644237 (Or. P.U.C. Dec. 20, 2012) (stating, in the context of analyzing a utility's failure to reasonably consider alternatives, that the decision-making process of the utility is properly included in the prudence analysis). However, even if a utility company was imprudent because it failed to prospectively consider alternatives, that imprudence may be mitigated by a demonstration that the decision of the utility nevertheless protected ratepayers from excess cost. *See PacifiCorp*, UE 246, Order No. 12-493 at 26, 2012 WL 6644237 ("It is possible that the utility may be able to present sufficient information from external sources . . . to establish that its ultimate decision was prudent—regardless of what internal decision-making process was used[.]"). Conversely, even if a utility reasonably considered alternatives but then chose to pursue an unreasonable alternative, the consideration of alternatives may be insufficient. *Cf. id.* (stating that although the prudent investment standard does not require optimal results, it does require that the

utility's action was objectively reasonable). In the context of the case before us, we need not and do not fully address these issues. We therefore conclude that the Commission did not apply a new "least cost alternative" test without notice, as PNM contends, but instead reasonably applied the prudence standard previously established by the Commission and recognized by this Court.

### 3.  The Commission's finding of imprudence is supported by substantial evidence in the record

{33}  We next address PNM's argument that the Commission's finding of imprudence is not supported by substantial evidence. In the proceedings before the hearing examiner, PNM called a number of witnesses to testify that its decisions to repurchase 64.1MW of capacity and renew the five leases were prudent. PNM witnesses Gerard Ortiz and Elisabeth Eden both testified that retaining its Palo Verde assets after the termination of the original leases had long been part of PNM's planning and strategy. Regarding the benefits of retaining its Palo Verde capacity, Ortiz testified that Palo Verde is a "zero emission plant" with a "strong performance record" and is "PNM's lowest cost resource from an economic dispatch perspective." Ortiz also testified that PNM's decisions to renew the leases and repurchase the 64.1 MW were consistent with its Integrated Resource Plans (IRPs)[1] filed in 2008 and 2011. However, on cross examination, Ortiz could not recall if the 2008 IRP analyzed the repurchase of the 64.1 MW and stated "that the 2011 IRP is really the relevant document." Ortiz additionally could not recall the price inputs for natural gas or solar used in PNM's modeling for the 2011 IRP.

{34}  To counter PNM's reliance on its 2011 IRP, NMIEC witness James Dauphinais testified that the IRP process did not conduct an analysis which would "determine whether allowing the leases to terminate, renewing the leases or purchasing the leases at fair market value was the most cost-effective resource option with respect to those leases." Dauphinais testified that the 2011 IRP instead ran an analysis which assumed that all of the Palo Verde leases would expire in 2020 and compared a scenario in which PNM renewed all the leases at their previous cost with a scenario in which PNM replaced the 178 MW of leased Palo Verde Capacity with a 252 MW combined cycle gas turbine generation plant. The results of this analysis revealed that the option of replacing the Palo Verde capacity with the gas plant would cost an estimated $51 million more than renewing the leases. According to Dauphinais, this analysis did not include the option of repurchasing any of the leased capacity at fair market value.

{35}  PNM witness Ortiz confirmed that the 2011 IRP did not examine the option of purchasing the leased Palo Verde capacity and, in an answer to an interrogatory, PNM

---

1An IRP is a document electric utilities must file periodically with the Commission, *see* 17.7.3.9 NMAC, that, *inter alia*, should seek to identify resource options and determine the "most cost effective resource portfolio and alternative portfolios[.]" 17.7.3.9(B)(4), (7) NMAC.

stated that it "had not performed any Strategist[2] runs, economic modeling, or financial analysis with respect to the acquisition of the interest in Palo Verde [Unit 2] at the valuation cited." Moreover, on cross examination, Ortiz agreed that PNM had not submitted any quantitative analysis in this proceeding regarding the benefits of renewing the five leases, relying instead on the 2011 IRP.

**{36}** Given this evidence, the hearing examiner focused her analysis of PNM's prudence on the 2011 IRP as the relevant IRP at the time PNM made the decisions at issue. The hearing examiner concluded that the 2011 IRP failed to demonstrate PNM's prudence because, *inter alia*, it "did not test extension of the leases and purchases of the 64.1 MW against a wide range of futures/scenarios and input assumptions." The evidence in the record is sufficient to support this finding. Although Ortiz testified that the 2011 IRP demonstrated PNM's prudence, "[t]he Commission is not bound by the opinions of experts so long as the Commission's ultimate decision is supported by substantial evidence." *Att'y Gen. of N.M. v. N.M. Pub. Serv. Comm'n*, 1984-NMSC-081, ¶ 15, 101 N.M. 549, 685 P.2d 957. The conflicting testimony of Dauphinais regarding the 2011 IRP supports the hearing examiner's findings. *See id.* ¶ 12 ("[E]vidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence."). Viewing the record in the light most favorable to the decision, we conclude there is substantial evidence to support the hearing examiner's determination that PNM failed to adequately consider alternatives to renewing the leases and repurchasing the 64.1 MW. *See NMIEC*, 2007-NMSC-053, ¶ 24.

**{37}** PNM also challenges the Commission's conclusions that PNM could not rely on the 2011 IRP to demonstrate its prudence because that IRP had not been admitted into evidence and had not been expressly accepted as compliant with the IRP rules in a previous case. We need not address these arguments because, regardless of whether the 2011 IRP was accepted as compliant or admitted into the record, substantial evidence in the record supports the hearing examiner's determination that the 2011 IRP "did not test extension of the leases and purchase of the 64.1 MW against a wide range of futures/scenarios and input assumptions." This finding was not modified or rejected by the Commission.

**{38}** For the foregoing reasons, we hold that the Commission's determination that PNM's decisions were imprudent was supported by substantial evidence, was not arbitrary or capricious, was not contrary to law, and was thus lawful and reasonable. We must next consider whether the Commission's remedies for PNM's imprudence were reasonable and lawful.

---

[2] The hearing examiner described Strategist as follows: "PNM uses Strategist, a computer software tool, to rank portfolios. Strategist can consider alternative resource portfolios with the goal of identifying through an optimization algorithm the most cost effective combination of resources as measured by [net present value]. It varies its assumptions, *i.e*, cost of fuel, carbon costs, through sensitivity analyses. Strategist determines whether PNM needs resources and recommends the most cost-effective portfolio to serve load over 20 years."

**B.**   **The Commission's Remedy Limiting Recovery for the Palo Verde Assets Was Lawful and Reasonable but the Denial of All Future Nuclear Decommissioning Costs Was Unlawful**

**{39}**   Under the prudent investment theory, "ratepayers are not to be charged for negligent, wasteful or improvident expenditures, or for the cost of management decisions which are not made in good faith." *PNM*, 101 P.U.R. 4th at 151. Finding imprudence, the hearing examiner in this case recommended that the Commission disallow all recovery for the cost of the five renewed leases and the value of the repurchased 64.1 MW. However, the Commission rejected a total disallowance as its only option and instead relied on the approach taken by the Oregon Public Utility Commission (Oregon PUC) in *PacifiCorp*, UE 246, Order No. 12-493, 2012 WL 6644237 as a persuasive example of a commission finding imprudence but disallowing only a portion of the utility's expenses.

**{40}**   Similar to the finding of imprudence in this case, the Oregon PUC in *PacifiCorp* found that the utility had acted imprudently by not considering alternatives to its chosen environmental compliance measures. *Id.* at 17, 28. The Oregon PUC concluded that "[b]ecause the purpose of a prudence review is to hold ratepayers harmless from any amount imprudently invested, a disallowance should equal the amount of the unreasonable investment." *Id.* at 31. However, the Oregon PUC faced a challenge in calculating how much to disallow:

> Quantifying the impact of [the utility's] imprudence has been hindered by the very actions that underlie our finding of imprudence—the utility's inadequate analysis and decision-making. Had [the utility] reasonably considered other compliance alternatives and performed proper and robust analyses, we would have the information necessary to calculate the harm to ratepayers for the utility's decision to proceed with its investments rather than pursuing other, least-costly, options. Without that information, we are left with determining a disallowance that reasonably penalizes [the utility] for its imprudence, while acknowledging our inability to assess a precise amount.

*Id.* Considering its options, the Oregon PUC rejected the argument of an intervenor that the utility's costs should be fully disallowed and instead determined that a partial disallowance of ten percent was an appropriate remedy. *Id.* at 31-32.

**{41}**   The Oregon PUC reasoned that its imprecise remedy was consistent with general ratemaking principles because "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit [of] a single correct result." *Id.* at 32 (first alteration in original) (quoting *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 314 (1989)). The Oregon PUC further concluded that its chosen remedy was within its discretion to determine a utility's rate base and explained that the partial disallowance was "reasonable in relationship to the potential harm to [ratepayers]" and

led to just and reasonable rates. *PacifiCorp*, UE 246, Order No. 12-493 at 32, 2012 WL 6644237.

**{42}** In this case, the Commission agreed with and adopted the approach applied in *PacifiCorp* that the proper remedy for a utility's imprudence "should equal the amount of the unreasonable investment" in order to "hold ratepayers harmless from any amount imprudently invested[.]" *Id.* at 31. Accordingly, the Commission did not deny PNM all recovery for the Palo Verde assets and, instead, crafted what it considered to be reasonable remedies intended to protect ratepayers. We address the approach taken by the Commission in this regard.

**1. The Commission's remedy limiting PNM's recovery to the net book value of $1,306/kW for the repurchased 64.1 MW and the cost of the renewed leases is reasonable and lawful**

**{43}** In its final order, the Commission found that the Palo Verde assets "had always been certificated capacity and long been found to be used and useful" and concluded that the prior authorizations in Case Nos. 1995 and 2019 allowing PNM to retain that Palo Verde capacity demonstrated an intent that Palo Verde would continue to be used to serve New Mexico ratepayers. Moreover, the Commission noted that multiple parties supported the finding of imprudence yet still recommended that the Commission allow recovery for the Palo Verde assets at a reasonable valuation. In particular, NMIEC and Western Resource Advocates (WRA) argued that Palo Verde is an asset valuable to PNM's customers and that the Commission should determine a reasonable valuation for both the repurchased 64.1 MW and the five renewed leases.

**{44}** With respect to the repurchased 64.1 MW, the Commission noted that the prior authorizations reserved its authority "to disallow recovery of [PNM's Palo Verde] costs to the extent found to be imprudent" and limited PNM to a repurchase at fair market value. The Commission found that PNM had failed to demonstrate its prudence and had also failed to demonstrate that it paid a fair market value for the 64.1 MW. Therefore, the Commission determined that an appropriate remedy, which would protect ratepayers from PNM's failure to consider alternatives to Palo Verde, would be to disallow recovery for the amount PNM paid for the 64.1 MW over the net book value of that capacity. The Commission considered the evidence presented and determined that the net book value of $1,306/kW was a reasonable value for the capacity and allowed PNM to bring the 64.1 MW into its rate base at that amount.

**{45}** With respect to the five renewed leases, the Commission noted that when it issued the prior authorizations granting PNM authority to renew the leases according to their terms it knew those terms specified that the leases would be renewed at fifty percent of the original cost. Accordingly, the Commission allowed PNM to recover the costs of the five renewed leases.

**{46}** The Commission's treatment of the 64.1 MW and the renewed leases in this ratemaking case was necessarily imprecise because, as in *PacifiCorp*, the very

behavior that caused the need for a remedy—PNM's failure to consider alternatives—impaired the Commission's ability to quantify the potential harm to ratepayers from PNM's imprudence. *See PacifiCorp*, UE 246, Order No. 12-493 at 31, 2012 WL 6644237 ("Quantifying the impact of [the] imprudence has been hindered by the very actions that underlie our finding of imprudence—the utility's inadequate analysis and decision-making."). Despite this, the Commission established valuations for the 64.1 MW and the renewed leases which it considered appropriate to protect ratepayers and result in just and reasonable rates. Such an approach is a lawful and reasonable exercise of the Commission's authority to determine the rate base of a utility under Section 62-6-14(A) and its obligation to ensure that rates are just and reasonable under Section 62-8-1.

**{47}**     We recognize NEE's and ABCWUA's concerns that a utility should not be rewarded for its imprudent failure to reasonably consider alternatives and acknowledge that total disallowance may be an appropriate remedy for such imprudence in some circumstances. *See PacifiCorp*, UE 246, Order No. 12-493 at 31, 2012 WL 6644237 (acknowledging the possibility of a full disallowance while concluding that "a disallowance should equal the amount of the unreasonable investment"). Under the particular facts and circumstances of this case, the Commission's decisions were reasonably made with due consideration of the unique regulatory history of this Palo Verde capacity and the arguments of several parties that Palo Verde provides significant value to ratepayers. Accordingly, it was reasonable and lawful for the Commission to conclude that a total disallowance was not justified in this case.

**{48}**     Several parties raise specific challenges to the Commission's chosen valuations of the Palo Verde assets. PNM challenges the Commission's denial of full recovery of the $2,550/kW purchase price for the 64.1 MW. On the other hand, NEE and ABCWUA contend that PNM is not entitled to any recovery for the Palo Verde assets. Considering both perspectives, we conclude that neither PNM nor NEE and ABCWUA have met their burden under Section 62-11-4 of showing that the Commission's determination to limit PNM's recovery to the net book value for the 64.1 MW and to recover the cost of the renewed leases was unreasonable or unlawful.

**{49}**     PNM claims that its purchase of the 64.1 MW was the result of an arm's-length transaction, negotiated following the procedures approved by the Commission in Case Nos. 1995 and 2019, and benefitted ratepayers by providing cost-effective, reliable, and carbon-free power. PNM therefore contends that it was entitled the entire purchase price of $2,550/kW for the 64.1 MW as an acquisition adjustment. *See Hobbs*, 1980-NMSC-005, ¶ 12 (holding that the Commission erred when it denied a utility recovery of an acquisition adjustment where the purchase was the result of an arm's-length transaction and the purchase benefitted ratepayers because the price was less than the appraised value). PNM further claims that its purchase price was a fair market value for that capacity. We disagree.

**{50}**     First, the Commission found that PNM failed to demonstrate that its purchase price for the 64.1 MW was a fair market value for that capacity. Pursuant to the lease

provisions, PNM did not obtain an appraisal of the 64.1 MW and instead negotiated the purchase price with the lessors. Absent an appraisal, PNM relied on evidence of sales or valuations of other Palo Verde assets to support its negotiated purchase price of $2,550/kW. This evidence included: Palo Verde capacity purchased by PNM at a 2007 auction and given a rate base valuation of $2,549/kW; PNM's failed bid of $2,578/kW in a 2011 auction for Palo Verde capacity; and an appraisal submitted by PNM in Case No. 13-00390-UT showing a value of $2,500/kW for the Palo Verde capacity PNM sought approval for in that case.

**{51}** The hearing examiner rejected PNM's reliance on these previous sales and valuations, finding that (1) the 2007 purchase was not sufficiently contemporaneous because it was approved six years before PNM entered into the agreements to repurchase the 64.1 MW and PNM witness Eden admitted on cross-examination that energy markets had changed since that time; (2) the 2011 auction was not sufficiently comparable because it only involved a beneficial interest in that particular capacity, which would not include the "risks of typical ownership, such as [operation and maintenance costs], decommissioning costs, and costs of capital improvements"; and (3) the hearing examiner in Case No. 13-00390-UT had criticized the appraisal in that case and had recommended that it not be accepted to support PNM's proposed value for that capacity. In its final order, the Commission adopted the hearing examiner's findings regarding the "timing and comparability" of the sales and valuations relied upon by PNM. Viewing the entire record in the light most favorable to the Commission's decision, we conclude that there is substantial evidence to support the Commission's determination that PNM's reliance on these other sales and valuations failed to demonstrate that the $2,550/kW it paid to acquire the 64.1 MW at Palo Verde was a fair market value. *See NMIEC*, 2007-NMSC-053, ¶ 24.

**{52}** Second, PNM's argument that it was entitled to an acquisition adjustment under *Hobbs*, 1980-NMSC-005, ¶ 2 ignores the central issue facing the Commission—how to protect ratepayers from PNM's failure to consider alternatives to retaining the 64.1 MW. PNM fails to address how the Commission's remedy for PNM's imprudent decision-making process was unreasonable or without a rational basis. Accordingly, we conclude that PNM has not demonstrated that the Commission's remedy was arbitrary or capricious. *See Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 17.

**{53}** We next address NEE and ABCWUA's various arguments that the Commission's decision to grant recovery for the Palo Verde expenditures was not supported by substantial evidence and was contrary to prior Commission decisions. We are not persuaded by these arguments for the reasons set forth below.

**{54}** First, NEE and ABCWUA both contend that the Commission's used-and-useful determination is not supported by substantial evidence. The Commission has previously defined the used-and-useful standard to require that an asset is used or soon to be used and "its use is reasonable and beneficial to the public." *PNM*, 101 P.U.R. 4th at 162. The used-and-useful standard additionally recognizes a utility's obligation to "provide efficient and economical service." *Id.* In this case, the Commission noted that

the prior authorizations in Case Nos. 1995 and 2019 indicated an intention that the Palo Verde resources would continue to serve ratepayers. Additionally, PNM witnesses testified that Palo Verde is "a cost-effective and reliable generation resource" that provides PNM with base load generation. These witnesses testified that Palo Verde is carbon emission free and contributes to PNM's fuel diversity. Viewed in the light most favorable to the Commission's decision, this evidence is sufficient for a reasonable mind to conclude that Palo Verde Units 1 and 2 are used-and-useful. *See NMIEC*, 2007-NMSC-053, ¶ 24.[3]

**{55}**   We also reject NEE and ABCWUA's argument that the Commission's $1,306/kW valuation for the 64.1 MW, based on the net book value of that capacity, was not supported by substantial evidence in the record. Because PNM had been leasing Palo Verde Unit 2, it was necessary to recreate a net book value for the unit. PNM originally proposed a net book value of $1,596/kW but later in the proceedings revised this value and proposed a net book value of $1,306/kW. PNM witness Jason Peters testified in support of this revised net book value with calculations including the cost basis for each of the Palo Verde Unit 2 leases from the original sales and the value of the capital investments and common plant assets at Palo Verde. After considering net book values proposed by other parties, the Commission found that PNM's proposed net book value of $1,306/kW was appropriate. We conclude that this determination involving the Commission's technical expertise is supported by substantial evidence in the record. *See ABCWUA*, 2010-NMSC-013, ¶ 50.

**{56}**   We next consider NEE and ABCWUA's arguments that the Commission's decision to allow recovery for PNM's Palo Verde expenditures was contrary to its prior ratemaking decisions. The Commission rejected these arguments, determining that its prior authorizations in Case Nos. 1995 and 2019 indicated an intent to provide PNM with an opportunity to retain the Palo Verde capacity and potentially include the cost of doing so in its rates. This conclusion was reasonable and lawful and we therefore reject the arguments made by NEE and ABCWUA for the reasons stated below.

**{57}**   NEE and ABCWUA both rely on Case No. 2444 to contend that the Commission intended to bring the Palo Verde capacity into the rate base at $0. This reliance is misplaced. In Case No. 2444 the Commission decided that other leased Palo Verde capacity, repurchased by PNM outside the terms of the original leases, would be brought back into the rate base at $0 at the end of the original lease term. Case No. 2444 involved different capacity, repurchased by PNM in a different manner, and therefore does not render the Commission's decision regarding this capacity arbitrary and capricious. For these reasons, we also reject NEE's additional arguments which similarly rely on Case No. 2444 and other ratemaking cases involving the repurchase of Palo Verde capacity outside of the terms of the original leases.

---

[3]On appeal, the parties disagree as to whether a stipulated to used-and-useful finding for Palo Verde Units 1 and 2 from Case No. 2567 is still in effect or whether PNM had the burden in this case to demonstrate that those units are currently used-and-useful. Whether that stipulation is still in effect is not critical to our analysis because the Commission's finding that Palo Verde Units 1 and 2 are used-and-useful is supported by substantial evidence.

**{58}** ABCWUA also contends that because the Commission equated the original lease payments with capital costs in prior rate cases and PNM has recovered those payments as operating and maintenance costs, it is contrary to those prior ratemaking decisions and contrary to law for the Commission to allow PNM to recover its Palo Verde costs in this case. *See Moyston v. N.M. Pub. Serv. Comm'n*, 1966-NMSC-062, ¶ 18, 76 N.M. 146, 412 P.2d 840 ("[W]here prior capital investments were charged to operating expenses and the rate apparently fixed on that basis, a utility cannot later capitalize such amounts in determining original cost for rate making purposes."). We are not persuaded by this argument because, regardless of how PNM previously recovered its prior lease costs, in this case it sought recovery for new costs associated with the renewal of the five leases and the repurchase of the 64.1 MW.

**{59}** For the foregoing reasons, we conclude that the Commission's decision authorizing PNM to recover the $1,306/kW net book value for the repurchased 64.1 MW as well as the cost of the five renewed leases is in accordance with the law, supported by substantial evidence, and not arbitrary and capricious. However, the Commission's decision on PNM's imprudence did not end there. In its final order, the Commission noted that PNM's "actions in renewing and reacquiring the leases have exposed ratepayers to costs associated with [nuclear] decommissioning responsibilities that likely would not have been incurred had an alternative resource other than nuclear been selected" and concluded that "the appropriate remedy to protect ratepayers from the effect of PNM's imprudence is to shift the future burden of decommissioning related costs from the ratepayers to PNM." We turn now to consider PNM's challenges to this determination.

## 2. It was a violation of PNM's right to due process of law to deny recovery for all future nuclear decommissioning costs

**{60}** At the end of the useful lives of the Palo Verde units, the Nuclear Regulatory Commission and the Palo Verde participation agreement require the decommissioning of those units. Under the terms of the original leases, PNM was responsible for all of the nuclear decommissioning costs associated with the Palo Verde capacity it leased. Whether or not it had renewed the leases or repurchased the 64.1 MW, PNM would have remained responsible for the same share of these decommissioning costs. However, the Commission has not previously determined whether ratepayers would be responsible for decommissioning costs for any period that Palo Verde Units 1 and 2 are not owned or leased by PNM. To reserve funds for these costs, PNM maintains nuclear decommissioning trusts and has previously recovered its contributions to these trusts in its rates.

**{61}** The hearing examiner found that the decommissioning trusts for Palo Verde Units 1 and 2 are completely or almost completely funded and recommended that PNM currently cease contributing to the trusts and collecting those costs from ratepayers. The hearing examiner also recommended that PNM be given an opportunity to reinstate rate recovery for contributions to the trusts if it appears in the future that the funds will be insufficient. However, the Commission determined that part of the "appropriate

remedy to protect the ratepayers from the effect of PNM's imprudence" included "shift[ing] the future burden of decommissioning related costs from the ratepayers to PNM" and concluded that "[i]n the event additional funding is required, PNM shall bear those expenses without recovery from ratepayers."

**{62}** PNM appeals this decision, arguing that it was not supported by substantial evidence in the record, was contrary to prior Commission practice, and that the Commission violated PNM's right to due process of law by making this decision without providing PNM notice and an opportunity to be heard. Because we conclude that the Commission violated PNM's right to due process, we do not reach PNM's other arguments.

**{63}** "It is well settled that the fundamental requirements of due process in an administrative context are reasonable notice and opportunity to be heard and present any claim or defense." *ABCWUA*, 2010-NMSC-013, ¶ 21 (quoting *Jones v. N.M. State Racing Comm'n*, 1983-NMSC-089, ¶ 6, 100 N.M. 434, 671 P.2d 1145). To argue that PNM was on notice that the disallowance of decommissioning costs was at issue, the Commission relies on the recommendation of the hearing examiner to deny, for the time being, recovery for contributions to the trusts. However, that recommendation did not address the permanent disallowance of recovery. The hearing examiner adopted the recommendation of ABCWUA witness James Dittmer, who acknowledged that it is possible that the nuclear decommissioning trusts will not be adequately funded at the retirement of the Palo Verde units and fully expected PNM to be able to later request rate recovery for its decommissioning costs. The hearing examiner's recommendation, along with the testimony on which it was based, was limited to the temporary disallowance of recovery and did not provide PNM with notice of a permanent disallowance of recovery for its contributions to the nuclear decommissioning trusts.

**{64}** The Commission additionally argues that PNM was on notice regarding the issue of permanent disallowance of recovery for decommissioning costs because all expenses a utility seeks to recover in its rates are subject to review in accordance with the Commission's obligation to ensure that rates are "just and reasonable" under Section 62-8-1. However, the Commission has previously recognized that "it would be burdensome to require a utility to justify every expenditure which is the basis of the request for rate relief" and that, therefore, the Commission assumes that an expense was reasonably incurred unless it is challenged. *PNM Gas Servs.*, 2000-NMSC-012, ¶ 72 (quoting *Pub. Serv. Co.*, 50 P.U.R. 4th 416, 427 (N.M. Pub. Serv. Comm'n 1982)). As we have discussed, ABCWUA witness Dittmer challenged PNM's current recovery for its decommissioning costs but acknowledged that PNM would be able to later request recovery should the need arise.

**{65}** We are unconvinced that the challenge to PNM's current recovery for its decommissioning costs or the obligation of the Commission to ensure that rates are "just and reasonable" provided PNM with notice of a potential permanent disallowance of all recovery for its future contributions to the nuclear decommissioning trusts. Because the issue of a permanent disallowance of recovery for contributions to the

nuclear decommissioning trusts appears to have been first raised by the Commission in its final order, PNM was not afforded an opportunity to be heard on the issue. Accordingly, we conclude that the Commission's decision to disallow recovery of any future decommissioning costs as a remedy for PNM's imprudence deprived PNM of its right to due process of law.

## C. It Was Reasonable and Lawful for the Commission to Deny PNM Separate Recovery for the Leasehold Improvements

{66}   Under the terms of the original leases, PNM was responsible for all of the costs associated with the asset including the lease payments, capital investments, and operating and maintenance costs. Title to the leasehold improvements would vest in the lessors rather than with PNM. PNM has previously included the cost of the leasehold improvements in its rate base, using a Commission approved depreciation rate based on the federal operating licenses for Palo Verde running through 2046.

{67}   In its final order, the Commission addressed arguments that PNM would recover twice for the value of its leasehold improvements if it were able to recover both the $1,306/kW net book value and the leasehold improvements separately. The Commission accepted that the $1,306/kW net book value included the value of the leasehold improvements, and denied PNM separate recovery for the $49 million value of the improvements. PNM challenges the Commission's denial of a separate recovery for these costs on the grounds that the Commission's decision unreasonably departs from prior Commission practice and is contrary to law. For the reasons that follow, we reject PNM's contentions.

{68}   First, PNM argues it reasonably relied on prior Commission practice allowing it to recover for the leasehold improvements past the end of the initial lease terms and that, by denying separate recovery for the leasehold improvements, the Commission has disregarded its prior treatment of the improvements. *See Hobbs*, 1993-NMSC-032, ¶ 9. We conclude that, under the Commission's broad ratemaking authority under Section 62-6-14, it was reasonable and lawful for the Commission to find that PNM's proposed net book value included the value of the leasehold improvements and common plant assets and that recovery of the $1,306/kW net book value would include recovery for those leasehold improvements. Because PNM will continue to recover the value of its leasehold improvements through its net book value, it was not contrary to the Commission's prior practice for it to disallow PNM to recover for the leasehold improvements separately.

{69}   Second, PNM contends that the Commission's decision to include recovery of the leasehold improvements in the recovery of the net book value is contrary to the holdings of both *Cruzan v. Franklin Stores Corp.*, 1963-NMSC-056, 72 N.M. 42, 380 P.2d 190 and *Board of Education v. Thunder Mountain Water Co.*, 2007-NMSC-031, 141 N.M. 824, 161 P.3d 869. Both of these cases are inapposite. In *Cruzan,* this Court concluded that a lessee could not offset his liability to the lessor by the value of improvements made to the property, especially where the title to the improvements

vested with the lessor by the terms of the lease. 1963-NMSC-056, ¶ 6-8. In *Thunder Mountain*, this Court held that it was not a "double recovery" to require a school board to pay the fair market value for a utility's property in a condemnation action without deducting earlier payments made by the board to the utility to aid in construction of that property. 2007-NMSC-031, ¶¶ 6-7. Neither of these cases concern issues related to ratemaking, nor the Commission's authority to determine an asset's value and its obligation to balance the interests of the ratepayers and shareholders. *See* Section 62-6-14(A); Section 62-3-1(B). Indeed, this Court's decision in *Thunder Mountain* was based in large part on the distinction between standards with respect to ratemaking and those involved in a condemnation action. 2007-NMSC-031, ¶¶ 8-20.

**{70}** We conclude that it was neither contrary to law nor prior Commission practice for the Commission to allow PNM to recover the value of the leasehold improvements in the net book value and to disallow PNM to recover the cost of the leasehold improvements separately.

**D.     The Commission's Decision Denying a Request to Reopen the Proceedings after Issuing a Bench Request Was Lawful and Not a Violation of ABCWUA's Due Process Rights**

**{71}** ABCWUA argues that the Commission violated its own procedural rules and due process of law by not reopening the proceedings to allow ABCWUA and several other parties an opportunity to reply to PNM's response to a bench request. Because the bench request pertained to the issue of recovery of PNM's Palo Verde expenditures, we address ABCWUA's arguments here.

**{72}** After the closure of both the initial and supplemental evidentiary hearings, the hearing examiner issued her initial recommended decision. Commissioner Lyons then issued a bench request directing PNM to answer questions regarding the potential financial, maintenance, layoff, and contractual consequences of the hearing examiner's recommendation to deny all recovery for the cost of the five renewed leases and repurchased 64.1 MW. *See* 1.2.2.30(B) NMAC (granting a single commissioner authority to "issue any procedural orders prior to, during, or after a public hearing"). NEE filed a motion requesting that the bench request be withdrawn or, in the alternative, that PNM's response to the bench request be stricken. The next day, PNM filed a response to the Commission's bench request and several parties, including ABCWUA, jointly filed a motion "oppos[ing] the addition of any new evidence . . . unless the Commission orders the evidentiary portion of this matter reopened and a hearing on new evidence presented on [PNM's] response," including additional discovery, cross-examination of witnesses, and the presentation of response and rebuttal testimony.

**{73}** In its order on these motions, the Commission found that PNM's response mostly reiterated evidence already in the record but also "include[d] additional information that ha[d] not previously been admitted into evidence." Stating that it uses bench requests to investigate whether to reopen the evidentiary proceedings, the Commission concluded that the "mere request for information does not indicate that the Commission is

considering such information as substantive evidence or constitute admission of such information into the record." Accordingly, the Commission stated in its order that it would not reopen the proceedings but would instead "affirmatively exclud[e from consideration] that information contained in PNM's response to [the bench request] that is not already part of the record." This reasoning was consistent with a prior order in this case in which the Commission reopened the proceedings following several other bench requests. In that order, the Commission concluded that it is consistent with its procedural rules for it to issue a bench request for the limited purpose of obtaining information to decide whether to reopen the proceedings and that it cannot consider any information in response to such a bench request in making its final decision unless it reopens the evidentiary proceedings and provides other parties an opportunity to respond, as due process requires.

**{74}** On appeal, ABCWUA argues that the Commission's order denying the motion to reopen the proceedings violated its own procedural rule, 1.2.2.35(K) NMAC, and the principles of due process incorporated into that rule. We do not agree.

**{75}** First, the Commission's order was not a violation of its procedural rules. 1.2.2.35(K) NMAC provides that the Commission may, at any time, "require the production of further evidence upon any issue" and that "[a]ll parties and staff will be given an opportunity to reply to such evidence submitted and cross-examine the witness under oath." In this case, the evidentiary proceedings were closed, PNM's response to the bench request was not in evidence, and the Commission affirmatively excluded from consideration any information in PNM's response not already in the record. Contrary to ABCWUA's argument, the requirement under 1.2.2.35(K) NMAC that staff and other parties be given an opportunity to respond to submitted evidence is inapplicable because the information in PNM's response was not evidence in the record. Instead, the Commission requested information to determine whether to reopen the proceedings, consistent with its authority to reopen the proceedings on its own motion and to consider facts and proposed evidence supporting a party's motion to reopen the proceedings. 1.2.2.37(E)(4) NMAC (providing that the Commission may reopen the proceeding on its own motion "when it has reason to believe that conditions of fact or law have so changed as to require, or that the public interest requires, the reopening of such proceeding"); 1.2.2.37(E)(1), (2) NMAC (providing that a party "may file a motion to reopen the proceeding for the taking of additional evidence" and shall support that motion with a "brief statement of proposed additional evidence").

**{76}** Second, the Commission's procedure in this case did not violate the fundamental requirements of due process in the administrative context, namely, reasonable notice and an opportunity to be heard. *See ABCWUA*, 2010-NMSC-013, ¶ 21. All parties were notified of Commissioner Lyons' bench request to PNM and of PNM's response, the parties were provided with an opportunity to respond on the issue of whether the Commission should reopen the proceedings, and the Commission considered the motions filed by NEE and the joint movants in making its decision to not reopen the proceedings. The Commission provided the parties with reasonable notice and an opportunity to be heard on whether to reopen the proceedings. Therefore, it was not a

denial of due process for the Commission to decline to reopen the proceedings for supplemental evidentiary hearings.

**{77}** ABCWUA contends that the Commission must have considered the information in PNM's response in making its final decision. However, the Commission's decisions on Palo Verde in its final order do not rely on the information from PNM's response to the bench request and instead rely on separate legal and factual grounds. ABCWUA has not identified what information in PNM's response it contends the Commission relied on nor has it identified any part of the Commission's final order which relies on that information. Under Section 62-11-4, the party appealing a decision by the Commission has the burden of demonstrating that the decision was unreasonable or unlawful. Without more, we are not persuaded by ABCWUA's bare assertion that the Commission must have relied on the information in PNM's response to the bench request in making its decision. *See ABCWUA*, 2010-NMSC-013, ¶ 35 (concluding that the appellant had failed to meet its burden under Section 62-11-4 by failing to present evidence that commissioners had not reviewed the record).

## IV.  BALANCED DRAFT

**{78}** PNM appeals the Commission's decision to deny it recovery for the costs of converting San Juan Generating Station Units 1 and 4 to a balanced draft system. Balanced draft technology reduces the pressure in the system by both pushing and pulling the gas through the boiler and environmental controls and is designed to reduce fugitive emissions. A brief overview of the recent environmental regulatory history of San Juan is helpful in understanding the context of these costs.

**{79}** Over a number of years, several plans were proposed to implement federal regulations on haze-causing emissions in New Mexico. *See generally New Energy Economy*, 2018-NMSC-024, ¶¶ 3-5 (discussing the responsibility of states to develop plans to implement federal environmental regulations and the history of the plans to control haze-causing emissions in New Mexico). In 2011, the Environmental Protection Agency (EPA) rejected portions of New Mexico's state implementation plan and proposed a federal implementation plan which required the installation of a specific emission control technology on all four San Juan units. *Id.* ¶¶ 3-4 (explaining that the EPA may develop a federal implementation plan if a state implementation plan is inadequate); *Approval and Promulgation of Implementation Plans; New Mexico*, 76 Fed. Reg. 52388, 52388-89 (Aug. 22, 2011). The New Mexico Environment Department (NMED) and PNM challenged the federal plan, arguing that the state plan required a less expensive technology which would satisfy the federal regulations.

**{80}** As the challenge to the federal plan was pending, in April 2012 an application for a revision to an air quality permit for San Juan was submitted to NMED on behalf of PNM. The application contained two possible scenarios—one under the federal plan and the other under the state plan—both of which also included the conversion of all the units to balanced draft. A report estimating the costs under both scenarios concluded that balanced draft may be necessary for the installation of the emission control

technology required by the federal implementation plan but would not be necessary for the technology in the state implementation plan. NMED issued a permit which approved both scenarios in August 2012. Subsequently, the EPA approved a revised state implementation plan which required the closure of San Juan Units 2 and 3 and the installation of the less expensive emission control technology on San Juan Units 1 and 4. *Approval and Promulgation of Implementation Plans; New Mexico*, 79 Fed. Reg. 60985, 60986 (Oct. 9, 2014). After the approval of the revised state implementation plan, NMED revised the permits for San Juan, both of which still incorporated conversion of Units 1 and 4 to balanced draft.

{81}   In Case No. 13-00390-UT, PNM sought Commission approval to abandon San Juan Units 2 and 3 and replace that capacity with other generation resources in accordance with the revised state implementation plan. The Commission resolved that case by approving a stipulation reached by PNM and several other parties in an order we affirmed in *New Energy Economy*, 2018-NMSC-024, ¶ 46. The stipulating parties agreed that the installation of the emission control technology at San Juan was prudent but "also agree[d] that the prudence and reasonableness of the costs of the balanced draft [would] be determined in a PNM general rate case" in which PNM would have the burden to "make an affirmative demonstration that incurrence of the costs of balanced draft was prudent and reasonable."

{82}   In this proceeding, PNM sought to include in its rate base the $52.3 million it spent to convert San Juan Units 1 and 4 to a balanced draft system. Several parties opposed the inclusion of the balanced draft costs. During the hearing, WRA introduced into evidence emails between Bruno Carrara, the Utility Division Director of the Commission, and Richard Goodyear, the Air Quality Bureau Chief at NMED. In these emails Carrara asked Goodyear how the balanced draft system came to be incorporated into the regulatory framework at San Juan. In his response, Goodyear explained that balanced draft was not required by the regional haze regulation and was not required for the installation of the less expensive emission control technology required by the state implementation plan. Goodyear went on to state:

> Please note that PNM's assertion that the state of New Mexico required the balanced draft conversion is incorrect. PNM's request to implement the balanced draft project was entirely voluntary and only appears in the air quality permit because PNM requested the inclusion of the project in their air quality application. As PNM was in compliance with all applicable ambient air quality standards in effect prior to the proposed installation of the balanced draft project, it should be noted that the project is not required to comply with any applicable ambient air standard.

PNM witness Chris Olson agreed that PNM proposed balanced draft as an environmental compliance measure and that balanced draft is not required to comply with the regional haze requirements.

**{83}** In its final order, the Commission adopted the recommendation of the hearing examiner and denied PNM recovery for the costs of the balanced draft conversion on the grounds that PNM had failed to demonstrate that these costs were prudently incurred. The Commission declined to give the balanced draft costs the presumption of prudence and rejected PNM's reliance on its permits to demonstrate the prudence of the costs. The Commission based these decisions on the finding that "[b]ecause [San Juan] would not be in violation of any environmental standards without the [balanced draft system], there would have [been] no reason for the NMED to require its installation but for PNM's request." The Commission rejected PNM's argument that this finding was outside the scope of its authority. Finally, the Commission rejected PNM's arguments that the conversion to balanced draft was prudent because it reduced emissions and improved workplace health and safety, finding that PNM had failed to demonstrate either with sufficient evidence. On appeal, PNM argues that the Commission's conclusion that balanced draft was not required to comply with the applicable environmental standards was beyond the Commission's authority and that the Commission's finding that the balanced draft costs were imprudent was contrary to law.

**{84}** We first address whether the Commission exceeded its authority. The scope of the Commission's authority and jurisdiction is a question of law and we accord the Commission's interpretation of its own jurisdiction "little deference." *Doña Ana*, 2006-NMSC-032, ¶ 7. By statute, the Commission has the

> general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates . . . all in accordance with the provisions and subject to the reservations of the Public Utility Act, and to do all things necessary and convenient in the exercise of its power and jurisdiction.

Section 62-6-4(A); *see also* N.M. Const., art. XI, § 2 ("The public regulation commission shall have responsibility for regulating public utilities . . . in such manner as the legislature shall provide.").

**{85}** PNM argues that by finding that the balanced draft conversion was not required for San Juan to comply with the relevant environmental regulations, the Commission exceeded this statutory authority and infringed on the authority of NMED regarding environmental regulation. *See Colonias Dev. Council v. Rhino Envtl. Servs., Inc. (In re Application of Rhino Envtl. Servs.)*, 2005-NMSC-024, ¶ 14, 138 N.M. 133, 117 P.3d 939 ("The Environmental Improvement Act grants the Department and its Environmental Improvement Board . . . the power to regulate the environment on behalf of the citizens of New Mexico."). Specifically, PNM contends that this finding by the Commission is contrary to NMSA 1978, Section 74-2-7(L) (2003) which states that

> a final decision on a permit by [NMED] . . . that a source will or will not meet applicable local, state and federal air pollution standards and regulations shall be conclusive and is binding on every other state agency

and as an issue before any other state agency shall be deemed resolved in accordance with that final decision.

PNM's argument is unconvincing.

**{86}**  The Commission's finding that balanced draft was included in the permits for San Juan at PNM's request and not because it was required by the applicable environmental regulation was a finding specifically concerning the reasonableness of costs PNM was seeking to include in its rate base. Such a decision is squarely within the authority of the Commission under Section 62-6-4(A) to regulate the rates of public utilities and the obligation of the Commission under Section 62-8-1 to ensure that those rates are just and reasonable. The Commission's finding did not concern whether San Juan Units 1 and 4 "meet applicable local, state, [or] federal air pollution standards," as prohibited by Section 74-2-7(L), and thus did not exceed the Commission's authority.

**{87}**  We next turn to whether the Commission's finding that PNM failed to demonstrate the prudence of the balanced draft costs was contrary to law. We have previously recognized that "the Commission has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred." *Zia Nat. Gas Co. v. N.M. Pub. Util. Comm'n (In re Zia Natural Gas Co.)*, 2000-NMSC-011, ¶ 13, 128 N.M. 728, 998 P.2d 564. PNM argues that the balanced draft costs "were the product of governmental mandates and, therefore, [were] necessary and presumed prudent."

**{88}**  PNM relies on *Alabama Power*, 237 P.U.R. 4th 337 (Ala. Pub. Serv. Comm'n 2004) to argue that there is a strong presumption that costs incurred to comply with a governmental mandate, such as environmental compliance costs, are prudent. However, as the Commission recognized, the decision in *Alabama Power* is based on the rationale that environmental compliance costs are "not costs that [the utility] can simply choose not to incur" and that the utility "has little or no control in terms of their timing or their relative magnitude." 237 P.U.R. 4th at 341-42. Here, however, the Goodyear email and Olson's testimony provided substantial evidence to support the Commission's finding that there is "at least a strong inference that the Permits included the installation of the [balanced draft system] primarily because PNM requested it." Moreover, PNM's argument ignores that it agreed in Case No. 13-00390-UT that it would bear the burden of affirmatively demonstrating the prudence of the balanced draft costs in its general rate case. Given this prior stipulation and the evidence indicating that balanced draft was in PNM's permits primarily at its own request, it was lawful for the Commission to reject PNM's argument that the balanced draft costs were entitled to a presumption of prudence.

**{89}**  For the foregoing reasons, we conclude that the Commission's denial of PNM's balanced draft costs was within the Commission's authority to regulate the rates of public utilities and was not contrary to law.

## V.     FOUR CORNERS POWER PLANT COAL SUPPLY AGREEMENT

**{90}** PNM sought to include $19.5 million in its cost of service for its portion of a new fifteen year coal supply agreement (CSA) at Four Corners Power Plant. The new CSA replaces the previous CSA, which was set to expire in July 2016. Like the previous agreement, the new CSA includes a take-or-pay provision under which the owners of Four Corners are required to pay for a minimum amount of coal even if they do not need and take that coal.

**{91}** The hearing examiner recommended that the Commission approve the inclusion of the CSA costs in PNM's cost of service. Both NEE and the Coalition for Clean Affordable Energy (CCAE) filed exceptions to this recommendation. The Commission rejected these challenges and adopted the hearing examiner's recommendation to allow recovery for the CSA costs. On appeal, NEE argues that the Commission's decision was arbitrary and capricious, contrary to law, and not supported by substantial evidence. We disagree.

**{92}** First, NEE raises several challenges which go beyond the CSA and are instead directed, in essence, at the prudence of PNM's continued use of Four Corners as a generation resource. In its final order, the Commission determined that evidence had not been presented that PNM had a choice to discontinue its use of Four Corners. On appeal, NEE broadly points to the testimony of one of its witnesses, David Van Winkle, to support its contention that evidence was presented that PNM could have discontinued use of Four Corners in 2016. Nothing in Van Winkle's testimony undermines the Commission's determination. While Van Winkle testified that in his opinion it was imprudent for various reasons for PNM to make a long term commitment to Four Corners, the only decision challenged in his testimony was PNM's decision to sign the new CSA. NEE also relies on Van Winkle's testimony regarding El Paso Electric Company's decision to cease participation at Four Corners. However, evidence that El Paso Electric had the choice to discontinue its use of Four Corners does not, without more, indicate that PNM had the same choice. Accordingly, the Commission's conclusion that its "primary concern . . . [was] whether the CSA obtains coal at a reasonable cost and on reasonable terms" was supported by the evidence in this case, and we decline to recognize NEE's arguments directed at PNM's continued use of Four Corners as a generation resource.

**{93}** NEE also levels two challenges directed at the Commission's conclusion that recovery of the cost of the CSA was reasonable. First, NEE contends that *PNM Gas Services*, 2000-NMSC-012 requires that a utility use a cost/benefit analysis to evaluate contracts with take-or-pay provisions and it was contrary to law for the Commission to not require PNM to do so here. NEE's reliance on *PNM Gas Services* to support this proposition is misplaced. In that case, this Court affirmed the Commission's use of a cost/benefit analysis to determine whether the utility could recover in its rates the costs of discounts it applied to a take-or-pay rider. *Id.* ¶¶ 26-41. That case did not concern the reasonableness of the take-or-pay contract and, as such, is inapposite to the issue of whether the cost or terms of the Four Corner's CSA are reasonable.

**{94}** Second, NEE argues the Commission's conclusion that "NEE's focus on the choice of coal as a fuel failed to provide any basis upon which [it] could say that the terms of the CSA were unreasonable" placed the burden on NEE rather than on PNM, contrary to Section 62-8-7(A). We are not convinced. PNM supported the reasonableness of the CSA with witness testimony regarding its cost and terms. PNM witness Susan Taylor testified that, using estimates that were higher than the actual price of the new CSA, PNM's pre-contract analysis showed that the new CSA was more cost effective than a gas plant. PNM witness Chris Olson additionally presented testimony that the take-or-pay provisions in the new CSA are consistent with industry standards and are comparable to similar provisions in the current San Juan CSA. Further, Olson testified that the take-or-pay provisions of the new CSA are more favorable to PNM than the previous CSA in several ways. In its final order, the Commission expressly discussed this evidence before determining that NEE's challenge gave it no basis to find that the cost or terms of the CSA were unreasonable. This finding was based on substantial evidence in the record and did not improperly shift the burden from PNM to NEE.

**{95}** For these reasons, we reject NEE's arguments that the Commission's decision to include the costs of the Four Corners CSA in PNM's cost of service was arbitrary and capricious, contrary to law, and not supported by substantial evidence.

## VI. RATE 11B

**{96}** Utilities often charge different classes of ratepayers different rates. *N.M. Att'y Gen. v. N.M. Pub. Regulation Comm'n*, 2015-NMSC-032, ¶ 29, 359 P.3d 133. In this case, PNM proposed to change its rate design so that the rates charged to the various rate classes would more accurately reflect the cost of providing service to those rate classes. The calculated revenue requirements for each rate class varied significantly and, in order to mitigate dramatic increases for certain rate classes, PNM proposed a "banding" process which would establish upper and lower limits on the percentage of the rate increase for each class. However, PNM proposed to not apply rate banding to Rate 11B, water and sewage utility customers including ABCWUA. Instead, PNM proposed to increase Rate 11B by the calculated revenue requirement for the class, which was lower than the lower limit of the band.

**{97}** PNM supported its proposal to exclude Rate 11B from rate banding with the testimony of Stella Chan and David Aguirre. Chan testified that PNM proposed excluding Rate 11B from rate banding to "effectuate the intent of the Amended Stipulation" in Case No. 10-00086-UT. According to both Chan and Aguirre's testimony, PNM agreed in the Amended Stipulation to work cooperatively with Rate 11B customers to ensure that those customers would not be "unduly penalized" by a proposed change to PNM's time of use (TOU) on-peak period. Rates charged during TOU on-peak periods are higher than those in off-peak periods to reflect the cost of serving customers and to encourage customers to use electricity during off-peak periods. In this case, PNM proposed to shift its TOU on-peak period by two hours to more accurately reflect its generation and delivery costs.

**{98}** Chan and Aguirre both further testified that the agreement reached between PNM and the Rate 11B customers, including ABCWUA, was to shift the data used to calculate Rate 11B's rates by two hours in anticipation of the two hour TOU on-peak period shift and in recognition of the historical ability of Rate 11B customers to adjust the majority of their usage to off-peak hours. Chan testified that the benefits of that agreement with Rate 11B customers would be reversed if rate banding was applied to Rate 11B, which was why PNM proposed to exclude Rate 11B from rate banding.

**{99}** However, ABCWUA witness Joseph Herz presented testimony which criticized PNM's proposed two hour TOU shift and recommended that the Commission not approve that shift until a more complete analysis had been performed. On examination by the hearing examiner, Herz testified that the agreement between PNM and ABCWUA did not include the proposed two hour shift and that he did not support such a shift. Herz testified that the agreement instead concerned the methodology used to calculate Rate 11B's demands for cost allocation purposes and would apply whether or not the Commission approved the two hour TOU shift. Finally, Herz admitted that PNM proposed to exclude Rate 11B from banding "in order to effectuate some of the goals of the stipulation" but testified that, in his opinion, Rate 11B should be excluded from banding whether or not the TOU shift was approved.

**{100}** In its post-hearing brief, PNM stated that its proposal to exclude Rate 11B from rate banding "was specifically and explicitly stated to be in accordance with Paragraph 39 of the Amended Stipulation, which presumed that the TOU pricing period would be changing." PNM recognized that Herz opposed the TOU shift and argued that, should the TOU shift not be approved, "the Commission should re-visit PNM's proposal to leave Rate 11B out of the banding process." In its response brief, ABCWUA claimed this was a change in position for PNM and argued that due process required that the Commission not consider it.

**{101}** The hearing examiner rejected ABCWUA's due process argument and recommended denying PNM's proposal to exclude Rate 11B on two bases: (1) the conflicting positions of PNM and ABCWUA as to whether their agreement was contingent on the TOU shift; and (2) that there was testimony that PNM's proposal would shift costs to other ratepayers but no testimony as to the extent of that impact. The Commission adopted the hearing examiner's findings, specifically noting that the recommendation was based on the lack of adequate evidence supporting the proposal.

**{102}** On appeal, ABCWUA challenges the Commission's decision on several grounds, but its primary contention is that the Commission's decision violated its right to due process of law. As we have previously discussed, "the fundamental requirements of due process in an administrative context are reasonable notice and opportunity to be heard and present any claim or defense." *ABCWUA*, 2010-NMSC-013, ¶ 21 (quoting *Jones*, 1983-NMSC-089, ¶ 6). ABCWUA repeats its contention that the Commission's decision was based on PNM's post-hearing brief, which ABCWUA argues deprived it of notice and a meaningful opportunity to be heard. Specifically, ABCWUA argues that PNM's testimony did not connect exclusion of Rate 11B to the proposed TOU shift and,

therefore, ABCWUA was denied an opportunity to respond to that argument. ABCWUA's arguments are contrary to the record and are without merit.

**{103}** Chan's testimony expressly connected PNM's proposal to exclude Rate 11B from rate banding with the Amended Stipulation from Case No. 10-00086-UT, which the testimony of both Chan and Aguirre consistently connected with PNM's proposal to shift the TOU on-peak period by two hours. This testimony provided ABCWUA with more than adequate notice of the connection between these two issues. Not only did ABCWUA receive this notice, it was provided with an opportunity to respond to PNM's position and did so. ABCWUA witness Herz presented testimony on the proposed two hour TOU shift, the agreement between PNM and ABCWUA pursuant to the Amended Stipulation, and PNM's proposal to exclude Rate 11B from rate banding.

**{104}** However, Herz's testimony conflicted with the testimony of Chan and Aguirre on these issues. This conflicting testimony, together with the lack of evidence on the effects of PNM's proposal on other ratepayers, failed to persuade the hearing examiner and, ultimately, the Commission that PNM's proposal to exclude Rate 11B from rate banding would result in just and reasonable rates. It was for that reason, and not any alleged change in position in PNM's post-hearing brief, that the Commission rejected PNM's proposal to exclude Rate 11B from rate banding. This decision by the Commission was reasonable, was supported by the evidence in the record, and was not made in violation of ABCWUA' s right to due process of law.

## VII.    PREPAID PENSION ASSET

**{105}** NMIEC claims that the Commission's inclusion of the $137.8 million Prepaid Pension Asset (PPA) in PNM's rate base was contrary to *New Mexico Attorney General*, 2015-NMSC-032, and was supported by insufficient evidence. NMIEC's arguments are unavailing on this point.

**{106}** A PPA is "the amount by which investor contributions to a pension trust and earnings on those contributions exceed pension expenses." *N.M. Att'y Gen.*, 2015-NMSC-032, ¶ 3. Ratepayers benefit from this excess because its earnings are deemed to be income for a utility, reducing the amount of revenue the utility must collect from ratepayers. *Id.* ¶ 5. Consequently, this Court has held "that some or all of a prepaid pension asset should be included in the rate base to the extent that the evidence evinces that the asset was investor-funded, as opposed to ratepayer-funded." *Id.* ¶ 19. We admonished utilities not to "voluntarily overfund their pension funds simply to earn a favored rate of return." *Id.* ¶ 22.

**{107}** On appeal, NMIEC claims that the "totality of the testimony in the record" in this case "demonstrates that PNM has failed to show that the PPA amounts it seeks to include in rates are entirely funded by shareholder capital." Specifically, NMIEC contests the use of illustrative cost of service estimates from prior settlement agreements as evidence of investor contributions to pension funds. PNM contends that sufficient evidence did support the hearing examiner's determination that the PPA was

investor-funded and that the Commission previously relied on illustrative cost of service to determine the reasonableness of rates in Case No. 10-00086-UT.

{108}  In the proceedings below, PNM witnesses Elisabeth Eden and Jason Peters testified that the amount PNM sought to recover for its PPA was based on actuarial calculations which determined the amount of legally required investor contributions to PNM's pension funds. NMIEC witness Michael Gorman testified that PNM had failed to prove that it had not recovered its pension contributions from ratepayers and questioned PNM's evidence that the PPA had resulted exclusively from investor contributions. PNM witness Jason Peters provided rebuttal testimony including further documentation of the investor contributions to the PPA.

{109}  Based on this evidence, the hearing examiner concluded that PNM investors contributed to the pension fund as they were legally required to do and that those contributions exceeded pension expenses such that the PPA could properly be included in PNM's rate base. In making this recommendation the hearing examiner rejected NMIEC's argument against the reliability of illustrative cost of service data, finding that such data was appropriate to help document investor contributions to the pension fund and that NMIEC had not suggested an alternative way for PNM to calculate those contributions. The Commission adopted the hearing examiner's recommendation, specifically finding that PNM's use of illustrative cost of service was reasonable.

{110}  Viewing the entire record in the light most favorable to the Commission's decision, we conclude that there is substantial evidence to support the Commission's determination that the PPA was investor, rather than ratepayer, funded. *See NMIEC*, 2007-NMSC-053, ¶ 24. The Commission's determination regarding the use of illustrative cost of service data is well within the Commission's technical expertise. NMIEC recognizes that the record contains specific testimony supporting that the PPA was investor funded, yet challenges the persuasiveness of that testimony. NMIEC asks that we reweigh the evidence, which we will not do, especially on this technical matter. *ABCWUA*, 2010-NMSC-013, ¶¶ 18, 50. Accordingly, we reject NMIEC's substantial evidence challenge on this point.

{111}  Nor do we conclude that the Commission improperly removed the burden of proof from PNM, as contended by NMIEC. NMIEC relies on the statement by the hearing examiner that "NMIEC does not suggest how PNM could have alternatively calculated the amount of ratepayer contributions." We have addressed this type of argument before. *See ABCWUA*, 2010-NMSC-013, ¶ 83 ("[T]he [Commission] did not shift the burden of proof to the opposing parties; the [Commission] simply held that the opposing parties had failed to discredit or rebut PNM's evidence[.]"). As in *ABCWUA*, the Commission did not shift the burden of proof on this matter merely by noting that NMIEC did not offer evidence it found persuasive to counter that evidence offered by PNM.

**{112}**  For the foregoing reasons, we reject NMIEC's arguments on appeal and conclude that the Commission's decision to allow PNM to recover $137.8 million for its PPA is in accordance with the law and supported by substantial evidence.

## VIII.   METHOD A

**{113}**  NMIEC appeals the adoption of Method A, which adjusts PNM's methodology for calculating customer fuel costs. NMIEC's primary contention is that Method A violates the statutory rate caps established in NMSA 1978, Section 62-16-4 (2014).[4] Because Method A does not increase the amount large and exempt customers pay for renewable energy and instead ensures that those customers will more accurately pay for their use of conventional energy, we hold that Method A does not violate the statutory rate caps under Section 62-16-4 (2014). We likewise reject NMIEC's arguments that Method A was adopted in violation of due process, is arbitrary and capricious, and would not result in just and reasonable rates.

**{114}**  As we have discussed, utilities charge different rates to different customer classes. *N.M. Att'y Gen.*, 2015-NMSC-032, ¶ 29. These classifications are often based on fuel needs, the purpose for which the fuel will be used, the time and duration of fuel use, and the possibility that a large customer could undertake self-generation if charged too much. II Leonard Saul Goodman, *The Process of Ratemaking* 964 (1998); *see also N.M. Att'y Gen.*, 2015-NMSC-032, ¶¶ 29-30 (discussing the utilization of "cost allocation" in ratemaking). This concept, called "cost allocation" or "differential rates," can be used to advance various policy objectives. *N.M. Att'y Gen.*, 2015-NMSC-032, ¶¶ 29-30.

**{115}**  Section 62-16-4 (2014) of the New Mexico Renewable Energy Act, NMSA 1978, Sections 62-16-1 to -10 (2004, as amended through 2014) directs the Commission to apply differential rates to promote the development of renewable energy. *See N.M. Att'y Gen.*, 2015-NMSC-032, ¶¶ 30, 41. The cost of a utility's renewable energy portfolio is shared among three customer classes. First, large customers are capped in their contribution to the renewable energy portfolio under Section 62-16-4(A)(2) (2014) (capping the contribution for "nongovernmental customers at a single location or facility . . . with consumption exceeding ten million kilowatt-hours per year"). Second, government customers that take specific steps to develop their own renewable energy generation are exempt from contributing to the renewable energy portfolio under Section 62-16-4(A)(3) (2014). Finally, other customers are not capped in their contribution but are protected under a reasonable cost threshold set by the Commission. *See* Section 62-16-4(C) (2014).

---

[4]These statutory rate caps were recently amended by our Legislature. *See* 2019 N.M. Laws, ch. 65, § 29 (removing the statutory rate caps for large customers and amending the manner in which certain government customers are exempt). How these amendments change the method by which PNM will allocate its fuel costs is a matter for the Commission. *See N.M. Att'y Gen. v. N.M. State Corp. Comm'n*, 1996-NMSC-002, ¶ 11, 121 N.M. 156, 909 P.2d 716 ("[T]his Court is not a rate-making body."). Accordingly, this opinion does not address this change in law, but instead addresses the arguments regarding Method A under the law in effect at the time of the Commission's final order in this case.

**{116}**  The fuel costs required to generate electricity are among the expenses public utilities can recover through rates. PNM has previously recovered some of its fuel costs through its base fuel rate, which reflects an average fuel cost. But, to account for fluctuations in fuel and purchased power costs, there is a statutory and regulatory mechanism called a fuel and purchased power cost adjustment clause (FPPCAC). *ABCWUA*, 2010-NMSC-013, ¶ 2; *see also* 17.9.550.6(D) NMAC ("[T]he objective of a[n] FPPCAC is to flow through to the users of electricity the increases or decreases in applicable fuel and purchased power expense per kilowatt-hour of delivered energy above or below a base fuel and purchased power expense."). The intended effect of an FPPCAC is to allow a utility company to collect its actual fuel costs. *See* 17.9.550.6(C) NMAC (stating that one objective of the FPPCAC rule is to "assure that utilities collect through the FPPCAC the amount actually expended for fuel and purchased power costs"). As explained by the hearing examiner,

> [i]f [a utility company's] actual fuel costs are greater than the revenues it collects from its base fuel rate, it recovers its undercollected fuel costs through its FPPCAC. Conversely, if [a utility company's] actual fuel costs are less than the revenues it collects from its base fuel rate, [it] returns its overcollected fuel revenues to customers through its FPPCAC.

**{117}**  The record indicates that the previous FPPCAC formula was the total projected fuel costs for the time period at issue, adjusted by the over- or undercharged amount for the prior period, divided by the total amount of energy projected to be billed in the period. This method, in effect, underpriced the fuel cost for conventional energy by including in the denominator the projected amount of both conventional and renewable energy, even though renewable energy does not have any associated fuel cost.

**{118}**  Although all customer classes were affected by this FPPCAC formula, the method of calculation resulted in a windfall to large customers, who were simultaneously undercharged for their conventional energy usage and statutorily capped in their contribution to the renewable energy portfolio under Section 62-16-4(A) (2014). This benefit could be substantial. For example, one large customer saved approximately $766,000 more in fuel costs from the inclusion of renewable energy in the FPPCAC than it contributed to the renewable energy portfolio.

**{119}**  In a series of cases over several years, the Commission sought to properly construe and then address this windfall to large customers. In this case, the Commission ordered PNM to revise its method for calculating fuel costs, specifically ordering PNM to remove renewable energy from its FPPCAC calculation. To carry out this order, PNM proposed Method A. Under Method A, PNM, in relevant part, (1) recovers all fuel and purchased power costs through the FPPCAC and none through its base rate; (2) excludes estimated renewable energy from the calculation of estimated nonrenewable fuel costs, such that nonrenewable fuel cost calculations include only estimated nonrenewable energy; and (3) breaks the FPPCAC charges to a customer into two parts which reflect the customer's use-ratio of nonrenewable energy to renewable energy, which always has a zero fuel cost.

**{120}** WRA Witness Dr. Douglas Howe testified in support of Method A, explaining that it would partially correct the fuel cost misallocation by more accurately charging customers for the true costs of their conventional energy usage. Dr. Howe believed that Method A would "clarify the costs and benefits of renewable energy" by allowing customers to "see explicitly the fuel costs of the conventional resources that serve them, and the zero fuel cost of the renewable energy that serves them." Dr. Howe testified that Method A would "provide a more accurate presentation and fair outcome for all PNM customers."

**{121}** Commission Staff recommended that the Commission adopt a modified version of Method A. The hearing examiner considered both Method A and the modified version and recommended that Method A be adopted without modification. The Commission agreed and ordered the adoption of Method A.

**A.      Method A is a Lawful Exercise of Commission Authority and Does Not Violate the Statutory Rate Caps in Section 62-16-4 (2014)**

**{122}** NMIEC first contends that Method A is unlawful because it imposes additional costs on customers whose renewable energy costs are capped under Section 62-16-4(A) (2014). We disagree and hold that Section 62-16-4(A) (2014) limits only renewable energy costs and does not otherwise restrict the Commission's authority to increase the cost of conventional energy usage in order to provide for just and reasonable rates.

**{123}** In addition to requiring utilities to procure an increasing percentage of renewable energy each year, Section 62-16-4 (2014) limits the amount that utilities can charge certain customers for renewable energy. Section 62-16-4(A)(2) (2014) provides that "the kilowatt-hours of renewable energy procured for [large] customers shall be limited so that the *additional cost* of the *renewable* portfolio standard to each customer does not exceed the lower . . . of two percent of that customer's annual electric charges or ninety-nine thousand dollars ($99,000)." (emphasis added). Government customers who take specified steps to produce their own renewable energy are exempt from contributing to the renewable energy portfolio under Section 62-16-4(A)(3) (2014).

**{124}** NMIEC relies on *New Mexico Attorney General*, 2015-NMSC-032 to argue that the Legislature intended Section 62-16-4(A) (2014) to limit the total electricity cost for large customers. However, NMIEC misconstrues *New Mexico Attorney General*. In that case, we affirmed the Commission's discretion to permit utilities to recover renewable energy costs that exceeded the statutory cap from non-capped customers. *N.M. Att'y Gen.*, 2015-NMSC-032, ¶¶ 34-36. We explained that the purpose of the statutory rate caps is to protect large and exempt customers from renewable energy costs, rejecting the contention that utilities must reduce their renewable energy procurement whenever costs exceed the statutory cap, and thereby protect other customers from bearing these costs. *Id.* ¶¶ 30, 45-46. We did not, however, hold that Section 62-16-4(A) (2014) protects large and exempt customers from paying the full costs of their conventional energy usage.

**{125}** NMIEC further contends that "[i]f the Legislature believed that . . . [there was] an unfair misallocation of fuel costs" it "would have added clear, unequivocal language" correcting that fuel misallocation. We disagree. Section 62-16-4(A)(2) (2014) expressly limits what large and exempt customers will pay for renewable energy but is silent with respect to the burden on those customers for the costs of conventional energy. This silence does not bar the Commission from otherwise allocating the costs of conventional energy usage or otherwise exercising its authority to provide for just and reasonable rates. *State v. Wyrostek*, 1994-NMSC-042, ¶ 17, 117 N.M. 514, 873 P.2d 260 ("We do not read language into the Act that is not there.").

**{126}** Provided renewable energy costs do not exceed the statutory rate caps, Section 62-16-4 (2014) does not restrict the Commission's authority to regulate a utility's method for charging customers for fuel usage. Method A does not impose additional charges for renewable energy usage on large and exempt customers, but rather increases their fuel costs to more accurately reflect the true costs of their conventional energy usage. Therefore, we conclude that Method A does not violate the statutory rate caps in Section 62-16-4(A) (2014) and is a lawful exercise of Commission authority.

## B.     The Commission's Adoption of Method A Was Consistent with Due Process

**{127}** NMIEC asserts that Method A was adopted in violation of due process, specifically arguing that it was adopted as a result of a biased or predetermined process. For the following reasons, we disagree.

**{128}** In Case No. 13-00183-UT, the Commission heard testimony regarding a possible misallocation of fuel costs and directed PNM to "identify whether or not there are 'disproportionate fuel benefits' and address rate and ratemaking issues and the associated and interrelated impacts on customer class related base rates, base fuel costs, the fuel clause and adjustments, as well as the renewable rate rider." Subsequently, in Case No. 15-00166-UT, the Commission concluded that the issue had been mischaracterized until that point and rejected a proposed solution in the form of a rate-rider. Instead, the Commission determined that the more appropriate approach would be to consider changes to the FPPCAC in a separate docket with more information. In this case, the Commission adopted Method A after considering the arguments for and against it, as well as a modified version of Method A proposed by Commission Staff. This process is distinguishable from the biased and predetermined decision that resulted in a denial of due process in the case relied on by NMIEC, *Reid v. New Mexico Board of Examiners in Optometry*, 1979-NMSC-005, ¶¶ 4, 9, 92 N.M. 414, 589 P.2d 198 (concluding that due process was denied when a board member, prior to disciplinary proceedings, said that the subject of the proceedings "would be losing his license soon").

**{129}** NMIEC further challenges the Commission's authority to solicit evidence, but "[a]t any stage of the proceeding the commission or presiding officer may require the production of further evidence upon any issue." 1.2.2.35(K) NMAC. Under Section 62-6-

4(A), the Commission has the authority to "do all things necessary and convenient in the exercise of its power and jurisdiction," including the discretion to solicit evidence in fulfillment of its statutory directives. *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-031, ¶¶ 31-32, 123 N.M. 239, 938 P.2d 1384 (affirming the administrative power "to consider evidence elicited by its own questions"). "[I]t could hardly be envisioned that Commissioners would sit as spectators, like Roman Emperors in the coliseum, and simply exhibit a 'thumbs-up or thumbs-down' judgment after the dust of battle settles in the arena." *Mountain States Tel. & Tel. Co.*, 1977-NMSC-032, ¶ 19. The Commission correctly adopted its rejection of NMIEC's similar arguments in Case No. 15-00166-UT.

{130} Additionally, the record does not support that NMIEC did not have reasonable notice or an opportunity to be heard, which are the fundamental requirements of due process in this context. *See ABCWUA*, 2010-NMSC-013, ¶ 21. As noted by the Commission, "this issue has had a long history and NMIEC has been a party to all of the proceedings[.]" NMIEC had ample opportunity to challenge Method A. NMIEC presented testimony regarding the impact of Method A and cross-examined PNM witness Gerard Ortiz regarding the alleged fuel misallocation, *inter alia*. NMIEC witness James Dauphinais testified that "NMIEC does not believe that under New Mexico law there is a disproportionate fuel benefit" and that "the cost and burden of Method A are not justified by the amount of fuel costs that would be reallocated." Finally, NMIEC voiced its objections to Method A in its post-hearing briefing to the Commission. This met the requirements of due process under *ABCWUA*, 2010-NMSC-013, ¶ 21.

{131} Finally, the Commission's decision to stay Case No. 16-00016-UT did not deprive NMIEC of an opportunity to challenge the imposition of a fuel clause adjustment. NMIEC had the opportunity to object to the stay, did not, and availed itself of the opportunity to challenge the imposition of a fuel clause adjustment in the instant case. For the foregoing reasons, we conclude that Method A was adopted in accordance with the requirements of due process and not as a result of a biased process, as alleged by NMIEC.

## C.     The Commission's Adoption of Method A Was Otherwise Lawful and Reasonable

{132} NMIEC challenges the reasonableness of Method A on various other grounds. However, there was substantial evidence to support the adoption of Method A, including Dr. Howe's testimony that Method A would correct the identified fuel cost misallocation and would result in a fairer outcome for all customers. We reject the argument that Method A is arbitrary and capricious and imposes an improper surcharge identical to the rate-rider the Commission rejected in Case No. 15-00166-UT. As the Commission explained, it rejected the surcharge approach and "the very notion of a [disproportionate avoided fuel benefit]" after determining that "the entire . . . issue arose through an error in PNM's fuel cost calculations."

**{133}** We also reject the argument that Method A is inherently flawed and unjust because its calculation did not include all quantifiable costs and benefits, as required to calculate the reasonable cost threshold under 17.9.572.14(C) NMAC. The record gives us no basis to conclude that fuel cost calculations are subject to the same requirements as the reasonable cost threshold and the matter is of a technical nature warranting heightened deference to the Commission. *See ABCWUA*, 2010-NMSC-013, ¶ 50. The parties and the hearing examiner devoted significant attention to the calculation of Method A. For these reasons, we hold that the adoption of Method A was lawful and reasonable.

## IX.    CONCLUSION

**{134}** We conclude that virtually all of the Commission's decisions are reasonable and lawful, but because we conclude that the Commission's denial of any future recovery for nuclear decommissioning costs violated PNM's right to due process of law we vacate and annul the Commission's final order en toto. *See* Section 62-11-5; *Hobbs*, 1993-NMSC-032, ¶ 6. We therefore remand to the Commission for further proceedings consistent with this opinion.

**{135}  IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**EDWARD L. CHÁVEZ, Justice, retired**
**Sitting by designation**

**J. MILES HANISEE, Judge**
**Sitting by designation**

**PETRA JIMENEZ MAES, Justice, retired**
**Sitting by designation, not participating**